**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
————————————————————————

**TSUNGANI CLEMONS, JACQUELINE L.**
**JOHNSON, JENNIFER THAYER and AMY**
**KNIGHTS,**

                                    **Plaintiffs,**

          **- vs -**                                                          **1:11-CV-0084**

**THE WELLPOINT COMPANIES, INC.,**

                                    **Defendant.**
————————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.      INTRODUCTION**

          Plaintiffs commenced this action each asserting four nearly identical causes of

action against Defendant, their former employer. The first of these ("the first causes of

action") allege violations of N.Y. Executive Law § 296(16), contending that Defendant

made improper inquiry of Plaintiffs' criminal histories.  The second of these ("the second

causes of action") also allege violations of N.Y. Executive Law § 296(16), contending that

Defendant terminated Plaintiffs based on their criminal histories.  The third of these ("the

third causes of action") allege violations of N.Y. Corrections Law § 752, contending that

Defendant terminated Plaintiffs based on their criminal histories. The fourth of these ("the

fourth causes of action") allege claims of common law libel *per se*, contending that

Defendant published and disseminated false statements that Plaintiffs were terminated for

1

"misconduct."

Presently before the Court are: (a) Defendant's motion for summary judgment, dkt. # 32, and (b) Plaintiffs' cross-motion for summary judgment and to amend the complaint to add a claim of retaliation in violation of N.Y. Executive Law § 296(16).  Dkt. # 35. Defendant has opposed the cross-motion for summary judgment and the motion to amend, dkt. # 45, and Plaintiffs have filed a reply to Defendant's opposition to the cross-motion and a sur-reply in further opposition to Defendant's motion for summary judgment. Dkt. # 46.  The Court has considered all of the documents submitted on this matter.

## II.   STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).  When considering cross-motions for summary judgment, the Court "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002)(quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for

one side or the other." Heublein, Inc., 996 F.2d at 1461.

### III.   BACKGROUND[1]

#### a.  WellPoint Nurse Case Managers

WellPoint employed Plaintiffs as Nurse Case Managers.  In this capacity, Plaintiffs provided nursing services to WellPoint members located nationwide, doing their work through phone calls, emails, and other electronic communications - a practice known as "telenursing."  Nearly every state requires someone practicing telenursing to possess a license recognized in the state where the patient resides. When Plaintiffs were hired, they were advised that they would be required to seek licenses in multiple jurisdictions and their employment letters specifically required them to go through multistate licensure "as a condition of [their] employment."  In addition, each Plaintiff signed an "Annual Attestation of Licensure" in which each agreed that she was "required to maintain [her] professional license in accordance with requirements set forth by the appropriate state licensing board."  Each Plaintiff further agreed that it was her "responsibility to notify [her] manager immediately if at any time [her] professional license is subject to disciplinary actions, revocations, or is rendered invalid for any reason."

#### b.  Multistate Licensing

To reduce inefficiencies involved in matching clients to nurses licensed in the patients' states, Defendant determined that it would require all Nurse Case Managers to go through "multistate licensing" applying for a nursing license in as many states as

---

[1]Except where indicated otherwise, the Background facts are taken from the parties' Local Rule 7.1(a)(3) Statements of Material Facts. This included facts asserted in Defendant's Statements of Material Facts ("DSOF") admitted by Plaintiffs or where, if denied, the record evidence supports the assertion; and facts asserted in Plaintiffs' Counter-Statements of Material Facts ("PSOF") admitted by Defendant or where, if denied, the record evidence supports the assertion.

possible.[2]

Some jurisdictions requested information about applicants' past criminal histories (including arrests, juvenile adjudications, youthful offender adjudications, dismissed criminal actions, non-criminal violations, and sealed adjudications) that other jurisdictions did not.  An applicant who was denied or questioned about a license in a more restrictive state (*i.e.* a state that asked about all past criminal histories including arrests, juvenile adjudications, etc.) could potentially come to the attention of a less restrictive state and be questioned about her prior criminal history even though the less restrictive state did not ask about that particular type of criminal history.  Further, a nursing license applicant who did not reveal requested prior criminal involvement but which was discovered by a jurisdiction would be "flagged" for non-disclosure and, possibly, deemed to be have supplied a fraudulent response resulting in denial of licensing privileges.  Moreover, when an applicant was flagged by a jurisdiction for non-disclosure, this often set off a ripple effect whereby other jurisdictions would open investigations into the applicant.  This, in turn, could result in suspension and/or revocation of licensing privileges in numerous jurisdictions, even in those jurisdictions that did not ask the question resulting in the flagged non-disclosure.

### c.  Universal Application

Defendant contends that to aid its Nurse Case Managers in avoiding the ripple effect from these disclosures and/or non-disclosures that could be flagged, it created a "Universal Application."  This document was a questionnaire that, essentially, summarized

---

[2]Plaintiffs contend that prior to August 2010, Wellpoint allowed some Nurse Case Managers to provided telenursing in jurisdictions where they had not yet been licensed.

the questions asked on the 50-plus[3] nursing applications each WellPoint nurse would fill out, including the questions on past criminal histories.  According to Defendant, the Universal Application served two purposes.  First, Defendant used the basic personal information that nurses provided (name, social security number, educational background, etc.) to automatically populate corresponding fields on every application that the nurse submitted.  Second, because the Universal Application included a "universal" version of the background questions on the various applications, Defendant's Clinical Multistate Licensure Unit ("CMLU") could use the information to advise Nurse Case Managers which states to avoid for licensing purposes.[4]

Defendant contends that it did not ask about criminal history information on the Universal Application in order to make any personnel decisions.  Plaintiffs argue to the contrary, citing their own discharges (discussed below).  Defendant further contends that it has never terminated or taken adverse action against an employee for providing truthful answers on the Universal Application or to questions on nursing licencing applications regarding past criminal involvement.  Again, Plaintiffs argue to the contrary, citing their own discharges.  Plaintiffs contend that although each had criminal histories, they provided "truthful" negative answers on the Universal Application and the various nursing

---

[3]Includes jurisdictions such as the District of Columbia.

[4]According to Defendant, typically a nurse only needed to avoid a few states, if any. WellPoint then resolved most licensing problems either by transferring the nurse to a team with few or no members in those states, or by walling off the small number of members managed by the nurse's current team.  Occasionally, a nurse's answers on the Universal Application indicated that the nurse would face significant problems getting licensed in many states. When that happened, WellPoint offered the nurse a choice: the nurse could either proceed with multistate licensing (despite the risks to the nurse's career), or the nurse could pursue alternative opportunities at WellPoint that did not require multistate licensure. Plaintiffs contend that they they were not given the option to pursue alternative opportunities with WellPoint, but it is undisputed that none of the Plaintiffs provided affirmative responses to the question on the Universal Application asking about background criminal involvement.

5

license applications asking about criminal histories because their particular criminal histories were sealed, juvenile adjudications, youthful offender adjudications, dismissed proceedings, and/or minor traffic infractions that, they believed, did not need to be included in their answers.  It is undisputed that Defendant has employed nurses with known criminal histories, including both arrests and convictions as both juveniles and adults, unless such criminal histories involved circumstances that prevented employment by federal law or because the conviction was job-related.[5]

### d.  Plaintiffs' Criminal Histories & Responses to Universal Application

After being hired, each Plaintiff went through the employer's multistate licensing procedure which began with WellPoint's Universal Application. The Universal Application asked each of the Plaintiffs five background questions, including:

> Have you ever been arrested, charged with, convicted of, pled guilty or no contest to, or been sentenced for any criminal or traffic offense in any state or country? (Note: Even though a charge or conviction has been pardoned, expunged, dismissed or deferred and your civil rights have been restored, you must answer 'yes' and provide certified court documents to our office.)

This question was designed to encapsulate the various criminal history inquires posed on numerous nursing license applications.[6]  Each Plaintiff answered "no" to

---

[5]Defendant contends it screens out potential employees with disqualifying criminal records (e.g. convictions covered by the Violent Crime Control and Law Enforcement Act) before an employee even gets hired through its employment application and a pre-employment background check. Thus, Defendant contends, by the time a nurse is hired and gets to the stage of completing the Universal Application, Defendant has already learned about the criminal history that it considers relevant.

[6]In particular:

A.  Nine jurisdictions asked if an applicant has ever been arrested: Alabama, Georgia, Louisiana, New Jersey, North Dakota, Oklahoma, Texas (Texas asked this question but also instructed that expunged and sealed matters need not be disclosed.  It did, however, "recommend[]" enclosing a copy of the "Court Order expunging or sealing the record in question."), Washington D.C., Wyoming;

(continued...)

this question, but each Plaintiff had at least been "arrested" and "charged" with criminal

offenses as follows:

> • Thayer was arrested twice: once as a juvenile, charged with burglary, petit larceny and trespass, eventually being convicted of misdemeanor trespass; and once as an adult, charged with Driving While Intoxicated, and pleading guilty to either Driving While Intoxicated or Driving While Ability Impaired.

> • Knights was arrested as a juvenile and charged with petit larceny and criminal contempt. She was convicted of disorderly conduct.

> • Johnson was arrested as a juvenile and charged with petit larceny. This charge

---

[6](...continued)
B. Six jurisdictions asked if an applicant has ever been charged: Louisiana, New Jersey, New Mexico, North Dakota, Wyoming, Texas (*see* previous note regarding Texas);

C. Seventeen jurisdictions asked about DWIs, DUIs, and/or similar offenses: Alabama, Arkansas, California, Colorado, Florida, Georgia, Indiana, Mississippi, Missouri, Nevada, New Jersey, Oregon, Utah, Vermont, Virginia, Wisconsin, Wyoming;

D. Fourteen jurisdictions asked about all "convictions" and/or "offenses" except for "traffic violation(s)," a description that appears to include violations: Alabama, California, Georgia, Illinois, Indiana, Iowa, Maine, Missouri, New Hampshire, New Mexico, North Dakota, Oklahoma, Vermont, Washington D.C.;

E. Seven jurisdictions asked about convictions for "violation(s)" or "petty offenses": Colorado, New Jersey, Ohio, Rhode Island, South Carolina, South Dakota, Texas (see previous note regarding Texas). Of them, New Jersey specifically asks about "disorderly persons offense[s]."

F. Six jurisdictions asked about receiving deferrals, interventions, or diversion programs: California, Ohio, Oklahoma, South Dakota, Texas, Washington State;

G. Five jurisdictions specifically asked about expunged offenses: California, Colorado, Louisiana, Oklahoma, Wyoming. Additionally, Texas did not require disclosure, but did "recommend[]" enclosing a copy of the "Court Order expunging or sealing the record in question."

H. Delaware and Louisiana asked about "any felony, misdemeanor or any other criminal offense[s]" to which the applicant had ever been convicted of or entered a plea of guilty or nolo contendere (no contest);

I. Montana asked about criminal charges to which the applicant pled guilty, forfeited bond, was convicted of a crime (whether or not since was suspended or deferred, or to which the applicant pled no contest or have prosecution deferred whether or not an appeal was pending. The Montana application noted that quote you must report but may omit documentation for (1) misdemeanor traffic violations resulting in fines of less than $100; and (2) charges or convictions prior to your 18th birthday and unless you were tried as an adult;"

J. Washington State asked "have you ever been convicted, entered a plea of guilty, no contest, or a similar plea, or had prosecution or a sentence deferred or suspended as an adult or juvenile in any state or jurisdiction?"

was adjourned in contemplation of dismissal, and later dismissed.

• Clemons was arrested as a juvenile and charged with possession of a malt beverage.  This charge was dismissed after Clemons completed an "adult diversion program" which included community service.

Because none of the Plaintiffs disclosed their criminal records on the Universal Application, WellPoint could not counsel them on which jurisdictions to avoid.

Plaintiffs then made similar non-disclosures in response to questions on numerous nursing license applications asking about arrests, juvenile adjudications, youthful offender adjudications, dismissed criminal actions, non-criminal violations, and/or sealed adjudications.  These non-disclosures caused three of the four Plaintiffs - Johnson, Thayer and Knights - varying degrees of difficulty with various state nursing boards, as discussed next.

**e.  Jacqueline Johnson**

In November and December of 2009, Johnson submitted nursing license applications to numerous jurisdictions.[7] Johnson answered "no" to every criminal history question on those state nursing license applications. This included answering "no" to questions about whether she had ever been arrested, charged, and/or received a deferral, intervention, or diversion program. It also included answering "no" to the criminal history questions on the Montana and Washington State applications which specifically sought information about juvenile offenses.

---

[7]In November and December of 2009, Johnson submitted nursing license applications to Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Hawaii, Illinois, Idaho, Indiana, Iowa, Louisiana, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington D.C., Washington State, West Virginia, and Wisconsin.

8

On December 19, 2009, Alaska informed Johnson that its background check had turned up an FBI record indicating her juvenile criminal history.  On December 30, 2009, Johnson applied for a nursing license in Texas.  Despite having already received notice from Alaska about her FBI record, Johnson answered "no" to questions on her Texas nursing application about whether she had ever "been arrested" or "been cited or charged with any violation of the law."  On January 4, 2010, Tennessee sent Johnson a letter demanding that she submit a letter explaining her arrest, and supply certain additional information if applicable.  Tennessee informed her that the "required information must be reviewed prior to licensure."  On January 13, 2010, Illinois sent Johnson a notice informing her that her nursing application "cannot be processed due to errors or deficiencies," and demanded that she submit a written statement and "official court documents" regarding her charge.

On February 22, 2010, Johnson applied for a nursing license in Georgia.  Despite having already received inquiries from Alaska, Tennessee, and Illinois, Johnson answered "no" to a question about whether she had "ever been arrested," and did not prevent WellPoint from submitting this application to Georgia on her behalf.  On March 22, 2010, Missouri sent Johnson a letter informing her that her nursing application would not be "evaluated" until she supplied a notarized explanation of her arrest.  On April 13, 2010, Delaware sent Johnson a similar letter, informing her that it would not process her nursing application until she provided "any and all court documents that provide a final disposition" of her charge.  On May 5, 2010, Johnson received a letter from Georgia informing her that her background check revealed a criminal history that she "failed to disclose," warning her "not to engage in nursing practice," and requiring her to supply additional information.

9

Johnson asserts that in December 2009, her father passed away and she was occupied with the circumstances of the situation "but nonetheless, within a few weeks after receiving the letter [from Alaska] I went to Molly Thayer[8] and let her know about it. She told me not to worry about it." Johnson Dec. ¶ 6.  She further asserts that after receiving a "few letters stating I needed to send the state licensing boards a letter explaining my juvenile case," she brought the letters to Kenneth Jackson[9] who told her to obtain documentation showing that the file had been sealed and that she was a minor at the time. Id. ¶ 7. She contends that she was also instructed by Jackson to "create a time-line of events of what happened in that situation to send to the state licensing boards," but she later learned that Defendant did not send the explanation letters and time-line to the various jurisdictions. Id. ¶ 7.

Jackson asserts that Johnson's rendition of their conversation is inaccurate. Jackson Aff. ¶ 9.  He asserts that when Johnson told him that she had received letters from certain states regarding a non-disclosed criminal incident, he told her "to immediately inform the appropriate people at WellPoint (including her direct manager and the CMLU), and work with them to address any outstanding issues." Id.[10]

It is undisputed that when Johnson informed Defendant of her non–disclosures, she still had nursing license applications outstanding to Arizona, Louisiana, Michigan, Missouri,

---

[8]Johnson does not explain who Molly Thayer is, but Defendant asserts that she was not Johnson's manager.

[9] Jackson is a Business Change Manager for Defendant and also served as the liaison between the business units and the Clinical Multistate Licensure Unit ("CMLU").

[10]Defendant contends that Johnson did not notify WellPoint about the state inquiries into her non-disclosures and criminal history until mid to late April 2010.

New Jersey, Oklahoma, and Wisconsin.  Defendant determined that if these applications

were pursued, Johnson might have faced additional inquiries so it allowed them to lapse.

On June 1, 2010, Johnson was interviewed by Whitney Ingle and Valerie Houk from

Human Resources, and Crystal Saunders from Ethics & Compliance.  Defendant asserts

that Johnson claimed that she did not promptly inform WellPoint about the state inquiries

because her father died in December, and that she had simply left at least one of the state

letters in the back of her car and forgot about it.  Johnson asserts that during the meeting

she was asked several questions about the application and accused of lying. Johnson

Decl. ¶ 9.  She further contends that she "informed them that my record is supposed to be

sealed and that I was always told I should never bring it up for any application." Id.  She

also asserts that she "timely raised these issues with Molly Thayer when [she] received

the first letter and later with Ken Jackson.  Neither of them gave [her] the impression that

this was something to be concerned about, and [she] believed them because [she]

continue to receive approved licensures from several states." Id. ¶ 10.

Defendant contends that:

Johnson's conduct placed WellPoint at considerable risk. Many states permit
an experienced nurse who has filed an application to practice nursing while
the application remains pending. This tentative permission ends, however,
when the state decides not to move forward with a license.  Johnson had
been told by Illinois, Missouri, and Delaware that her license applications
would not move forward, yet continued to perform her job as usual.  After
WellPoint learned what Johnson had done, it had to double-check Johnson's
work to make sure she did not have contact with members in those states.

WellPoint's multistate licensing committee collectively decided to recommend
Johnson's termination. Principally, the committee believed that termination was
warranted because, in its opinion, Johnson had committed misconduct by having
supplied false or misleading answers on her state nursing applications.  Johnson's
failure to "immediately" inform WellPoint of her licensing problems, in violation of
her previous commitment to WellPoint, also independently warranted termination

11

for misconduct.

Johnson's multistate licensing problems were also relevant. Several states had already sent inquiries or frozen her license applications, limiting Johnson's ability to perform her job. In WellPoint's experience, other states were likely to follow.  And to save Johnson even more inquiries, WellPoint permitted Johnson's applications to several other states to get abandoned.

DSOF ¶¶ 64-66.

Johnson was terminated for misconduct on June 8, 2010.  Defendant contends that WellPoint never told anyone other than Johnson that it classified her termination as "misconduct," and provides only a neutral employment reference listing the dates it employed Johnson, and the position she held. DSOF ¶ 69. Plaintiff challenges this, asserting that in June 2010, WellPoint Manager Margaret McDonnell informed a group of employees "that Jackie was fired because of an undisclosed old violation." Knight Decl. ¶ 13;[11] Clemons Decl. ¶ 11.[12] Johnson also relies on hearsay evidence in Clemons' declaration which indicates: "After my termination, I learned from several other Wellpoint employees that a large group of RN case managers was assembled and told by Steve Flores, a Wellpoint employee, that the reason we were fired was because we were 'flagged' on FBI background checks." Clemons Decl. ¶ 29.

---

[11]Knights declaration indicates that "[i]n June 2010 we learned of Jacqueline Johnson's termination for 'misconduct." Knights Decl. ¶ 13.  Following this sentence, the declaration describes what occurred on this date ("Our Verizon Group was taken into a conference room where Margaret McDonnell informed us that Jackie was fired for an undisclosed old violation."). Id.  Knights does not assert that Ms. McDonnell used the phrase "misconduct" in relation to Johnson's termination, see id., and the first sentence of this paragraph appears merely to be Knights' categorization of McDonnell's statement.  This rendition of the June 2010 meeting is confirmed by Clemons.  See fn. 12, infra.

[12]Clemons describes the same June 2010 meeting as described by Knights.  Like Knights' account, Clemons does not assert that McDonald used the phrase "misconduct" in relation to Johnson's termination. Clemons Decl. ¶ 11.

12

**f.  Jennifer Thayer**

Between December 2009 and February 2010, Thayer submitted nursing license applications to numerous jurisdictions.[13] Thayer answered "no" to every criminal history question on those state applications. This included answering "no" to questions about whether she had ever been arrested, charged, or convicted of a misdemeanor, violation, petty offense or any offense.  It also included answering "no" to the numerous state inquiries that specifically asked about DUIs, DWIs, and/or similar offenses.

On February 25, 2010, Arkansas issued Thayer a "Letter of Reprimand" based on her failure to disclose convictions for "Trespassing" and "DWI" on her nursing application. On March 3, 2010, Rhode Island informed Thayer that it knew about her Arkansas reprimand.  Thayer ultimately wrote forty-four letters to different state boards of nursing in an attempt to explain her non-disclosures.

Thayer did not inform WellPoint about her Arkansas reprimand until roughly two weeks after Arkansas issued it.  When she did, she contends that she told her manager, Barbara Leonard, who advised her to talk to Ken Jackson and not to worry about it. Thayer Decl. ¶ 4. Thayer also told Leonard that she did not disclose the information because the first incident occurred when she was 17 years old and she was told by her attorney that it was sealed and did not have to be disclosed; and that the second incident was a traffic violation and not a criminal conviction which she did not think she was

---

[13]Between December 2009 and February 2010, Thayer submitted nursing license applications to Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington D.C., Washington State, West Virginia, Wisconsin, and Wyoming.

required to disclose.  Thayer Decl. ¶ 5.

On March 23, 2010, Thayer was interviewed by Houk and Saunders.  When asked why she did not disclose the information she told them the same thing that she told Ms. Leonard. Thayer ¶ 7.  After the interview, WellPoint's Multistate Licensing Committee met to discuss her case. The Committee members collectively decided to recommend Thayer's termination.  Principally, the Committee believed that termination was warranted because, in its opinion, Thayer had committed misconduct by having supplied false or misleading answers on her state nursing applications.[14]  WellPoint terminated Thayer on March 23, 2010 for misconduct.  Defendant contends that  WellPoint never told anyone other than Thayer that it classified her termination as "misconduct, " and provides only a neutral employment reference, listing the dates it employed Thayer and the position she held.  DSOF ¶ 84. Thayer contends that, based on the same statements from Knights and Clemons that Johnson relies on, Defendant disclosed to others that she was discharged for misconduct.  See Knights Decl. ¶ 13; Clemons Decl. ¶ 11, ¶ 29; see nn. 11-12, *supra.*

**g.  Amy Knights**

In January 2010, Knights submitted nursing license applications to several jurisdictions.[15] She answered "no" to every criminal history question on those state

---

[14]Thayer notes that a few weeks after her termination, she started receiving responses from the states that she had sent explanation letters to.  Several states opened investigations and she met with their representative boards.  The state boards she met with dismissed their investigations and Arkansas ultimately rescinded its reprimand.  Presently, Thayer has no other investigations pending, no restrictions on her ability to practice nursing, and no reprimands on any of her nursing licenses. Thayer Decl. ¶¶ 9-11.

[15]In January 2010, Knights submitted nursing license applications to Alabama, Colorado, Connecticut, Hawaii, Illinois, Indiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Jersey, Pennsylvania, Rhode Island, Vermont, Virginia, Washington State, West Virginia and Wisconsin.  She also signed and completed applications for 18 other states, but the CMLU did not mail them to the relevant state nursing boards.

applications.  This included answering "no" to questions about whether she had ever been

arrested, charged, and/or convicted of a misdemeanor, violation, petty offense or any

offense.  It also included answering "no" on her New Jersey application, which specifically

asked about "disorderly persons offense[s]."  And it included answering "no" to the criminal

history questions on the Montana and Washington State applications, which specifically

sought information about juvenile offenses.

On March 4, 2010, Illinois wrote Knights to inform her that its background check

had resulted in an FBI "hit," and asked her for a personal statement regarding the petit

larceny and criminal contempt charges.  In early March 2010, Knights informed WellPoint

of the inquiry from Illinois.  Because of Knights' non-disclosure and the Illinois inquiry,

WellPoint did not follow-up on her long-pending applications to New Jersey and

Washington State, effectively letting those applications become abandoned by the

respective state nursing boards.  Additionally, after Alabama returned her application on

procedural grounds, WellPoint declined to resubmit it on Knights' behalf.

Knights contends that after receiving the letter from Illinois she contacted her

attorney who instructed her that she "never needed to disclose [the juvenile adjudication]

because it was sealed and as if it had never happened." Knights Aff. ¶ 10. She further

asserts that, a couple of weeks after disclosing the Illinois letter to Wellpoint, she received

an e-mail from WellPoint Licensing Analyst Lauren Fillingame. Id. ¶ 11. The e-mail

instructed Knights to obtain copies of her sealed juvenile record as soon as possible. Id.

Knights obtained a copy of her sealed court record and provided it to Wellpoint. Id.

On October 22, 2010, Knights was interviewed by Houk from Human Resources

and Laura Arambula from Ethics and Compliance.  Defendant contends that during this

15

interview, Knights claimed that she answered "no" on her nursing applications because she did not remember the juvenile incident, and initially believed that the FBI had the wrong person when it informed Illinois about her criminal records.  Houk and Arambula were of the opinion that Knights had been evasive during her interview and lacked credibility in her responses.[16]  Knights asserts that during this meeting she stated that she thought the FBI had the wrong person because "I did not recall being charged with contempt of court, although I later realized that that was the charge I pled guilty to. I told them I was surprised that this issue had come up so many years later because I was told it would be totally sealed. I told them it was my understanding that I did not have to disclose a sealed juvenile record and that I did not lie. I was truthful on my responses and not even evasive whatsoever." Knights Aff. ¶ 16.

After the interview, Houk and Arambula met to discuss Knights' situation. They collectively decided to recommend Knights' termination.  Houk and Arambula believed that termination was warranted because, in their opinion, Knights had committed misconduct by having supplied false or misleading answers on her state nursing licensure applications.  Additionally, Houk and Arambula believed that Knights had been evasive and lacked credibility in her responses during her interview.

Knights was terminated for misconduct on October 26, 2010.  At the time of her termination, Knights had not yet run into significant difficulties with state nursing boards over her non-disclosures.  Nevertheless, WellPoint believed she would likely encounter

---

[16]Houk and Arambula believed it was unlikely that Knights simply forgot something as traumatic as a juvenile arrest, and further believed it was unlikely that Knights actually thought that the FBI had the wrong "Amy Knights."

these difficulties in the future, particularly when she applied to renew her licenses.

Defendant contends that it never told anyone other than Knights that it classified her

termination as "misconduct," and provides only a neutral employment reference, listing the

dates it employed Knights and the position she held.  Knights contends, however, that

Defendant disclosed that her termination was for misconduct when Steve Flores, a

WellPoint employee, purportedly stated to a group of employees that the reason Plaintiffs

were fired was because they were "flagged on FBI background checks." Clemons Aff. ¶

29.

### h.  Tsungani Clemons

In November and December of 2009, Clemons submitted nursing license

applications to several jurisdictions,[17] and, in March 2010, applied for a nursing license in

Wyoming.  Clemons answered "no" to every criminal history question on those state

applications.  This included answering "no" to questions about whether she had ever been

arrested, charged, and/or received a deferral, intervention, or diversion program.  It also

included answering "no" to the criminal history questions on the Montana and Washington

State applications which specifically sought information about juvenile offenses.

According to Clemons, in April 2010 she began to hear from other WellPoint

employees that Thayer's termination "had to do with something that happened when she

was a minor." Clemons Decl. ¶ 8.  Clemons called her attorney in Vermont who had

---

[17]Clemons submitted nursing license applications to Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington D.C., Washington State, West Virginia, and Wisconsin.

handled her juvenile adjudication, and the attorney purportedly told her that her "records were sealed and there was no way of opening it [*sic*]." Id. ¶ 9.  She continued to complete state nursing license applications through May 2010. Id. ¶ 10.

In June 2010, Clemons learned that Johnson had been let go "for not disclosing something from when she was a youth." Id. ¶ 11.  Clemons and other employees were purportedly told that "WellPoint was able to 'dig this stuff up' and so, even if we thought something was sealed it really wasn't. We were told that if we had anything from our past then it was better to come forward with it." Id.

On June 10, 2010 Clemons received an application from Oregon. Id. ¶ 12.  On it was a question that asked if she had ever had anything expunged. Id.  Clemons thought that expunged meant dismissed so she decided to bring up the issue to Margaret McDonnell, her manager. Id.  Clemons contends that McDonnell told her "not to worry and to type up a statement of what happened and bring it to Molly Thayer and Ken Jackson." Id.  The facts are unclear as to what occurred next, but is undisputed that "[o]n June 10, 2010, Clemons emailed Lauren Fillingame to inform her that she 'had to answer yes' to the criminal background question on her Oregon application." DSOF ¶ 102.

On August 31, 2010, Clemons received an e-mail from Fillingame requesting that she leave work to obtain a copy of her records from the Vermont court where she had been prosecuted on the juvenile charge of possessing a malt beverage. Clemons Decl. ¶ 19.  The Vermont court purportedly told Clemons that her records were sealed "not only ... to the public but also sealed to me also." Id.  She conveyed this information to Fillingame and gave Fillingame the Vermont court's contact information so Fillingame could verify what Clemons told her. Id.

18

On October 22, 2010, Clemons was interviewed by Houk from Human Resources and Laura Arambula from Ethics and Compliance. Clemons asserts that she was asked why she had "lied" on her applications. Clemons Decl. ¶ 22. Clemons told them: "I never lied and I was always advised by my attorney that I could answer these questions with a 'no.'" Id. Clemons also asserts that she was told by Houk and Arambula that she had been "flagged" by some states based on her FBI record. Id. Clemons responded that she had a copy of her FBI record and that it was "clean." Id. Houk then instructed Clemons to provide them a copy of her FBI record, which Clemons did, but Houk purportedly stated that the "FBI report was from Ohio" and that it was not the "real FBI." Id. ¶ 23.

After the interview, Houk and Arambula met to discuss Clemons' situation. They collectively decided to recommend Clemons' termination. Houk and Arambula found Clemons' situation somewhat more difficult, in part because Clemons came forward before any states sent inquiries about her non-disclosures. In the end, however, Houk and Arambula recommended termination because, in their opinions, Clemons had committed misconduct by supplying false or misleading answers on her state nursing licensure applications, including questions about whether she had been arrested or charged. They also believed that while Clemons belatedly sought to correct those false or misleading answers, she did so only because several of her co-workers had already been terminated for non-disclosures on state applications. They were of the opinions that WellPoint's Code of Conduct and Core Values held employees to a higher standard. Additionally, Houk and Arambula believed that, although Clemons' conduct was arguably not as bad as that of Johnson, Thayer, or Knights, WellPoint needed to treat associates consistently. Defendant

asserts that it did not want to engage in the hairsplitting task of deciding what kinds of document misrepresentations were excusable.

On October 25, 2010, before Clemons was discharged and after she consulted with her attorney "on the laws for juveniles for New York State," she went to see Houk and presented her with "a copy of [these] laws." Clemons Decl. ¶ 24.  Houk responded that it was not WellPoint that was inquiring about Clemons' prior criminal history, but it was "multi-state." Id.

Clemons was terminated for misconduct on October 26, 2010.  WellPoint contends that it never told anyone other than Clemons that it classified her termination as "misconduct," and that it provides only a neutral employment reference listing the dates it employed Clemons and the position she held. Clemons asserts, however, that after she was discharged she was told by an unnamed WellPoint employee that Steve Flores, another employee, told a group of employees that "the reason [Plaintiffs] were fired was because [they] were 'flagged' on FBI background checks." Clemons Decl. ¶ 29.

## IV.    DISCUSSION

### a.  N.Y. Executive Law § 296(16) Claims

As indicated above, Plaintiffs assert four nearly identical causes of action against Defendant.  The first causes of action each allege that Defendant engaged in an "unlawful discriminatory practice [in violation of N.Y. Executive Law § 296(16)] by making an inquiry concerning an arrest or a criminal accusation" which was followed by a sealed youthful offender adjudication, a termination of the criminal action or proceeding in favor of the plaintiffs, and/or a conviction for a violation sealed pursuant to § 160.55 of the N.Y.

Criminal Procedure Law.  Am. Compl. ¶¶ 25, 56, 88,120.  The second causes of action

allege that Defendant violated § 296(16) by "taking adverse action against plaintiff[s]

based on" a sealed youthful offender adjudication, a termination of the criminal action or

proceeding in favor of the plaintiffs, and/or a conviction for a violation sealed pursuant to §

160.55 of the N.Y. Criminal Procedure Law. Am. Compl. ¶¶ 29, 60, 92, 124.

Section 296(16) provides in pertinent part:

> It shall be an unlawful discriminatory practice, unless specifically required or
> permitted by statute, for any . . . corporation . . . to make an inquiry about,
> whether in any form of application or otherwise, or to act upon adversely to
> the individual involved, any arrest or criminal accusation of such individual
> not then pending against that individual which was followed by a termination
> of that criminal action or proceeding in favor of such individual . . . , or by a
> youthful offender adjudication . . . , or by a conviction for a violation sealed
> pursuant to section 160.55 of the criminal procedure law or by a conviction
> which is sealed pursuant to section 160.58 of the criminal procedure law, in
> connection with the licensing [or] employment . . . [of] such individual;
> provided, further, that no person shall be required to divulge information
> pertaining to any arrest or criminal accusation of such individual not then
> pending against that individual which was followed by a termination of that
> criminal action or proceeding in favor of such individual . . . , or by a youthful
> offender adjudication . . . ,  or by a conviction for a violation sealed pursuant
> to section 160.55 of the criminal procedure law, or by a conviction which is
> sealed pursuant to section 160.58 of the criminal procedure law.

N.Y. Exec. L. § 296(16).

### 1.  First Causes of Action

Defendant argues that the first causes of action must be dismissed because there

are no facts supporting a violation of § 296(16)'s inquiry clause. In this regard, Defendant

argues, *inter alia*, that: (1) the undisputed facts demonstrate that the inquires on the

Universal Application were not "in connection with" an employment or licensing

determination; (2) Defendant cannot be held responsible for the inquiries made by the

21

various jurisdictions to which Plaintiffs applied for nursing licenses; and (3) the law allows

the follow-up inquiries made of Plaintiffs after it was discovered they failed to properly

answer questions on various nursing license applications.  Plaintiffs argue that they are

entitled to judgment on liability on the first causes of action because: (1) any inquiry into

criminal history protected by § 296(16) is a *per se* violation of the statute; (2) the

employer's inquiries were prohibited because they were "in connection with" the licensing

and/or employment of Plaintiffs;  (3) Defendant is responsible for the various jurisdictions'

nursing license application questions because Defendant "forced" Plaintiffs to apply to

these states; and (4) there was no legal justification for the follow-up inquiries once it was

discovered that Plaintiffs did not fully respond to the questions asked of them in various

jurisdictions.

### A.  In Connection With

The first phrase of the statute provides that "[i]t shall be an unlawful discriminatory

practice . . . to make an inquiry about . . . or to act upon adversely to the individual

involved, any [protected] arrest or criminal accusation . . .  <u>in connection with the licensing</u>

<u>[or] employment</u> . . . [of]  such individual."  § 296(16)(emphasis added). The term "in

connection with" plainly means that the inquiry or adverse action[18] must be causally

related to the licensing or employment of the individual.  <u>See</u> *Merriam-Webster On-Line*

*Dictionary*, "Connection."[19]  The *proviso* in the statute ("provided, further, that no person

---

[18]Although the making of an inquiry and acting adversely thereupon are stated in the disjunctive, the phrase ends with the requirement that the inquiry or act be"in connection with the licensing [or] employment . . . [of] such individual." § 296(16).

[19]("Connection:  1: the act of connecting : the state of being connected: as [a] : causal or logical relation or sequence <the connection between two ideas>  [b] (1) : contextual relation or association <in this
(continued...)

shall be required to divulge information pertaining to any arrest or criminal accusation [protected by the statute]") does not change the clear wording which preceded it, or create separate liability.  When read in totality and giving meaning to all of its terms, see Riches v. N.Y.C. Council, 899 N.Y.S.2d 177, 185 (1st Dep't  2010)("It is a fundamental tenet of statutory construction that every word in a statute is to be given effect."), § 296(16) clearly indicates that an inquiry into protected criminal history is illegal only if it is made in connection with an individual's licensing or employment.

An inquiry is casually related to the licensing or employment of the individual when the inquiry has the potential to affect the latter.  Because WellPoint does not grant licenses, this condition is inapplicable to this case.  An inquiry is "in connection with" an individual's employment when the answer has a tendency to affect the employment through such actions as a refusal to hire, a demotion, denial of a promotion, or a discharge.  An inquiry alone, without this employment connection, is insufficient.  This connection to an employment determination is in keeping with the purpose behind § 296(16), which is to protect individuals from adverse consequences from dismissed, sealed, juvenile, or youthful offender prosecutions. See In re Joseph M., 82 N.Y.2d 128, 131 (N.Y. 1993);[20]  New York State Dept. of Mental Hygiene v. State Div. of Human

---

[19](...continued)
connection the word has a different meaning> (2) : relationship in fact <wanted in connection with a robbery>")(http://www.merriam-webster.com/dictionary/connection)(last accessed March 6, 2013).

[20](The purpose in adding certain provisions to N.Y. Crim. P. L. § 160 and N.Y. Exec. L. § 296(16) addressing protected background "was to ensure that the protections provided to exonerated accuseds be consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law.")(Interior quotation marks and citation omitted, emphasis added).

Rights, 103 A.D.2d 546 (2d Dep't 1984);[21] Introducer's Memorandum in Support, *An Act to Amend Executive Law, in Relation to Unlawful Discriminatory Employer Practices Concerning Youthful Offenders and the Persons Convicted of Violations,* S. 3092, 230th Sess. (N.Y. 2007).[22]

It is undisputed that the criminal background question on the Universal Application was presented to Plaintiffs after they began working for Defendant.  Consequently, the inquiry could not have affected the respective hiring decisions.  Further, none of the Plaintiffs answered the question affirmatively divulging their criminal histories, so their answers to the question, in and of themselves, could not have affected each Plaintiffs' employment status.

To the extent that it could be argued that the inquiry was "in connection with" each Plaintiffs' employment status because it was related to the multiple jurisdictions' nursing applications that each was required to fill out, it is undisputed that Defendant continues to

---

[21]("As the legislative history and decisions make plain, the object of the legislation was 'consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law.'")(quoting Memorandum of Governor Carey, 1976 McKinney's Session Laws, p. 2451)(emphasis added).

[22]In the "Justification" for the bill, it is stated:

Section 296(15) of the Executive Law prohibits unfair employment and licensure discrimination, as provided in Article 23-A of the Corrections Law, against individuals who have criminal convictions. Section 296 (16) of the Executive Law provides greater protection to individuals whose cases have been terminated in their favor, not allowing employers even to ask about or use the arrest in making employment decisions. . . . Youthful offender adjudications ... and convictions for non-criminal offenses, fall under either of these categories, and thus individuals with these histories are entirely without protection against unfair employment and licensure discriminatory practices. Because of the failure to include them within the protection of the Human Rights Law, these two groups of individuals have no remedy if employers refuse to hire them. Indeed, it makes no sense that they have even less protection than people with adult criminal convictions. New York State should correct this oversight.

(emphasis added).

employ individuals who disclosed criminal histories.  Thus, it is unsupported speculation

that a positive answer *might* have affected each Plaintiffs' employment status.  To the

extent Plaintiffs argue that their negative answers on the Universal Application was a basis

for their discharges, the claim is subsumed by the second causes of action (discussed

next) and would be unnecessarily duplicative to include in the first causes of action.

There is also no merit to the argument that Defendant should be held liable under §

296(16)'s inquiry provision because Defendant "forced" Plaintiffs to apply to jurisdictions

that asked about background protected by § 296(16).  It is undisputed that when Plaintiffs

were hired, they were advised that they would be required to seek licenses in multiple

jurisdictions and their employment letters specifically required them to go through

multistate licensure "as a condition of [their] employment."  If Plaintiffs objected to this

requirement, they were free to seek employment elsewhere.  Further, it is undisputed that

Defendant used the Universal Application to counsel Nurse Case Managers which

jurisdictions to avoid if they were likely to run into problems due to their backgrounds.

Because none of the Plaintiffs divulged their criminal histories on the Universal

Application, Defendant could not perform this function for Plaintiffs.  It seems

disingenuous to argue that the employer should be held liable for the questions from the

jurisdictions that the employer would have counseled Plaintiffs to avoid *if* they had properly

answered the Universal Application.

Moreover, § 296(16) provides that it shall be "an unlawful discriminatory practice"

to inquire about protected criminal histories "<u>unless specifically required or permitted by

statute</u>." <u>Id.</u> (emphasis added). There is no dispute that various jurisdictions' nurse

licensing applications asked about criminal histories that would otherwise be protected

under New York law.  Many of the statutes, ordinances and regulations in the jurisdictions that Nurse Case Manager's practiced specifically permitted these inquiries.[23]  Thus, these jurisdictions were entitled to ask about the criminal histories pursuant to statute.  Defendant, therefore, is not exposed to liability even if it is presumed that it "forced" Plaintiffs to apply in these jurisdictions.  See generally Smith v. Bank of Am., -- F. Supp. 2d. --, 2012 WL 1788137, at *6-7 (E.D.N.Y.  May 18, 2012).[24] There is also no merit to Plaintiffs' argument that the "permitted by statute" language applies only to New York and Federal statutes.  The impact of such an interpretation would result in New York corporations being barred from engaging in interstate businesses, such as nursing, that have various state-specific licensing requirements.

The follow-up inquiries by Defendant, in and of themselves, also do not create liability under the inquiry prohibition in § 296(16).  "[T]he [New York] Legislature never intended employers to be foreclosed from requiring verification of the disposition of criminal charges once the existence of such charges has been legally and properly discovered." N.Y.S. Dep't of Mental Hygiene v. State Div. of Human Rights, 481 N.Y.S.2d 371, 375 (2d Dep't 1984), aff'd, 66 N.Y.2d 752 (N.Y. 1985).  Once an employer or licensing agency lawfully discovers an arrest record "it [is] permissible to consider the independent evidence of the conduct leading to the criminal charges." Skyline Inn Corp. v. N.Y.S. Liquor Auth., 44 N.Y.2d 695, 696 (N.Y. 1978).  Thus, because Defendant legally

---

[23]Defendant points out, as examples, that Washington State and Hawaii both permit such inquiries when they relate to "'bona fide occupational qualification[s].'" Wash. Admin. Code § 162-12-140(2)(a); Haw. Rev. Stat. § 378-3(2).  Licensure is a "bona fide occupational qualification" of a Nurse Case Manager. This includes seeking licensure in Washington State, a state that asks about "juvenile" adjudications.

[24](finding that a federal statute protected Bank of America's inquiry into petit larceny adjudication.)

and properly discovered the existence of Plaintiffs' criminal histories through the various jurisdictions' inquiries and by Clemons' unprompted disclosure, Defendant was allowed to seek verification on the disposition of those histories.  To the extent Plaintiffs contend that Defendant discharged them because of the substance of their backgrounds, that issue is subsumed in the second causes of action.

For the reasons discussed above, the first causes of action alleging improper inquiry are dismissed.

## 2.  Second Causes of Action

The next question is whether Defendant took adverse employment action against any Plaintiff based on, or because of, their protected criminal history as alleged in the second causes of action.  Inasmuch as the second causes of action allege employment discrimination based wholly upon circumstantial evidence,[25] the Court applies the well-recognized burden-shifting paradigm articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) to these claims.  <u>See</u> <u>Kravit v. Delta Air Lines, Inc.</u>, 1992 WL 390236, at *2 (E.D.N.Y. Dec. 4, 1992).[26]

Addressing Plaintiffs' § 296(16) discrimination claims in the context of Defendant's motion (whereby the facts are viewed in the light most favorable to Plaintiffs), Plaintiffs have met their *de minimis* burden of establishing a *prima facie* case.  Each has

---

[25]Although Plaintiffs point to interview notes indicating that WellPoint personnel considered Plaintiffs' failures to answer the Universal Application's criminal background history question when determining whether to discharge them, the critical question on the second causes of action is whether Defendant took adverse action against Plaintiffs because of their protected criminal histories.  Plaintiffs have failed to produce any direct evidence indicating that consideration of Plaintiffs' criminal histories motivated the discharge determinations.

[26](applying <u>McDonnell Douglas</u> on an employment discrimination claim brought under N.Y. Exec. L. § 296(15))

demonstrated that: (1) she has a criminal history protected from employment related inquiries;[27] (2) she was qualified for the position of Nurse Case Manager;[28] (3) she was discharged from her employment;[29] and (4) her discharge arose under circumstances from which an inference of discrimination could arise.  Only the fourth element warrants comment.  Although each Plaintiff failed to affirmatively answer the criminal history background question on Defendant's Universal Application (thus precluding any claim that the discharges were based on answers to the Universal Application criminal history question), each Plaintiff was queried about her protected criminal history once it was brought to the employer's attention that each failed to revealed such history on nursing applications specifically seeking the information.  Thus, because the discharge determinations followed these inquiries, there exists sufficient facts supporting an inference that each discharge was based upon the information obtained during the respective follow-up inquiries.

Having demonstrated a *prima facie* case, a presumption of unlawful discrimination is created shifting the burden of production to Defendant to offer a legitimate, nondiscriminatory rationale for its actions.  See McDonnell Douglas, 411 U.S. at 802–03. Defendant has met this burden by articulating that it discharged each Plaintiff because each failed to accurately respond to questions on governmental documents (i.e. various jurisdictions' nursing applications asking about criminal histories). This alone is a

---

[27]There is no genuine dispute that each Plaintiff had in her background a criminal proceeding covered by § 296(16).

[28]This fact is not disputed.

[29]This fact is not disputed.

28

legitimate, non-discriminatory basis for discharge even if each Plaintiff believed they were entitled to respond negatively to the criminal background questions. See Cai v. Wyeth Pharm., Inc., 2012 WL 933668, at *9 (S.D.N.Y. March 19, 2012);[30] Conway v. Geithner, 2011 WL 6936358, at *5 (E.D.N.Y.  Dec. 29, 2011);[31] see also Ganzy v. Sun Chem. Corp., 2008 WL 3286262, at *8 (E.D.N.Y. Aug. 8, 2008);[32] Rieff v. ITT Commc'n & Info. Servs., 1994 WL 658426 (S.D.N.Y. Nov. 18,1994);[33] Matter of Smith v. Kingsboro Psych. Ctr., 35 A.D.3d 751, 752 (2d Dep't 2006);[34] Moran v. Baxter, 597 N.Y.S.2d 688, 689 (1st Dep't 1993).[35]

Defendant also asserts that, by failing to properly respond to the nursing license applications, each Plaintiff conducted herself in a manner contrary to the employer's standard of acceptable conduct.  See DSOF ¶¶ 41-42.[36]  Because a district court does not "second-guess" a non-discriminatory business decision, see Yu v. New York City Housing

---

[30]("Even if Plaintiff thought he was permitted to delete the user account, he still violated company policy, which supports the finding that Defendant articulated a nondiscriminatory reason [for the adverse employment action].")

[31]("The fact that plaintiff responded falsely to Question 11 on her employment declaration was a legitimate reason for her termination, despite her alleged belief that a misdemeanor criminal charge did not qualify as a 'charge [] for any violation of law'.")

[32] ("courts have routinely held that lying on an employment application constitutes a legitimate, nondiscriminatory ground for termination")

[33] (falsification of an order form is a legitimate, non-discriminatory reason for termination)

[34](terminating employee for falsifying employment application did not violate N.Y. Correct. L. § 752)

[35]("respondent had the discretion to terminate petitioner for making material misrepresentations on his employment applications")

[36]WellPoint's Code of Conduct and Core Values required that employees act with integrity, which, Defendant determined, was not compatible with providing inaccurate information on state nursing applications.

29

Development Corp., 2012 WL 3660652, at *2 (2d Cir. Aug. 28, 2012);[37] Byrnie v. Town of

Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001),[38] Defendant's judgment that

Plaintiffs failed to abide by the employer's code of conduct represents a legitimate, non-

discriminatory basis for the discharges.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

509 (1993);[39] Martino v. Consol. Edison Co., 2012 N.Y. Misc. LEXIS 787, at *7-*8 (N.Y.

Sup. Ct., N.Y. Cnty. Feb. 23, 2012);[40] Wallick v. Barrios-Paoli, 670 N.Y.S.2d 473, 474 (1st

Dep't 1998);[41] see also Caidor v. Potter, 2007 WL 2847229, at *7 (N.D.N.Y. 2007).[42]

Moreover, Defendant contends that the discharges were justified because, in its

judgment, Plaintiffs failed to live up the standard of conduct for reasons beyond their

negative answers on the various jurisdictions' nursing license applications.  Johnson and

Thayer violated known requirements of their employment by failing to immediately notify

their managers that they had received indications that their professional licenses in certain

---

[37]("We do not second-guess his employer's decision . . . , provided that it was not based on discrimination.")

[38]("[The court's] role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.")

[39](An employer need only offer a basis for the employment decision in issue which,"taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.")

[40](under N.Y. Correct. L. § 752, employer lawfully terminated employee for "violating disclosure requirements as set forth in Con Edison's Standards of Business Conduct Policy," by not disclosing arrests)

[41](agency terminated petitioner not because of her arrest, but in part because she violated "the New York City Code of Conduct")

[42]("[b]y providing false information on his employment application, plaintiff demonstrated that he was not qualified for the position")

states were in jeopardy.  See Johnson Decl. ¶ 5;[43] Thayer Decl. ¶ 4.[44]  Knights, in

Defendant's judgment, failed to act with the integrity and honesty that the employer

demanded in her response to the employer's inquiry once it was learned that she flagged

by a state.

Further, Defendant contends that it determined, based upon its business judgment,

to discharge all four Plaintiffs so as to have consistency in the handling of

misrepresentations on state licensing applications and to enforce its policy that such

misrepresentation would not be excused.  Again, this is a satisfactory articulation of

legitimate, non-discriminatory bases for the employment actions in question.  See Kravit,

1992 WL 390236, at *3;[45] see also Stewart, 446 N.Y.S.2d at 951.[46]  Finally, Defendant

asserts that, at the time it made the respective discharge determinations, it was unknown

whether Plaintiffs would obtain licenses in several jurisdictions.  Defendant determined

that it "did not want to invest time and resources in employees who stood a good chance

of becoming legally incapable of doing their jobs."  Def. MOL p. 21.  Again, the

determination was a function Defendant's business judgment and constitutes legitimate,

non-discriminatory bases for the discharges.

This shifts the burden back to Plaintiffs to demonstrate that discrimination was the

---

[43](contending that she notified Defendant "a few weeks" from Alaska flagging her undisclosed criminal history)

[44](contending that she notified her manager "two weeks" after receiving a letter of reprimand from Arkansas)

[45](employer's blanket policy against hiring applicant who "intentionally lies on an employment application" established "a valid, non-discriminatory ground for its decision")

[46](in the civil service context, recognizing that "the only way to discourage material falsification of applications is to apply this sanction [i.e., disqualification from employment] across the board")

31

real reason for their discharges.  Plaintiffs base their claims of discrimination merely upon

their subjective beliefs that they were discharged because of illegal consideration of their

protected criminal histories.  But the Courts have long recognized that on a motion for

summary judgment, the Court

> must . . . carefully distinguish between evidence that allows for a reasonable
> inference of discrimination and evidence that gives rise to mere speculation
> and conjecture.  This undertaking is not one of guesswork or theorization.
> After all, an inference is not a suspicion or a guess.  It is a reasoned, logical
> decision to conclude that a disputed fact exists on the basis of another fact
> that is known to exist.  Thus, the question is whether the evidence can
> reasonably and logically give rise to an inference of discrimination under all
> of the circumstances.

Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999)(internal quotation marks

and citations omitted).  A plaintiff's "feelings and perceptions of being discriminated

against are not evidence of discrimination." Id. at 456.

The undisputed facts reveal that each Plaintiff failed to properly respond to the

questions presented on various jurisdictions' nursing license applications.  Thus, despite

Plaintiffs' interpretations of the reach of N.Y. Exec. L. § 296(16) into jurisdictions other

than New York, their failures to properly respond to the nursing license applications -

which applications were conditions of Plaintiffs' employments - constitute a justification for

their discharges.  Further, Plaintiffs' conduct jeopardized their ability to fulfill a function of

their employment of which they were aware when they accepted that employment.  That

is, their conduct jeopardized their ability to obtain licensure in the various jurisdictions as

they were required to do.  Moreover, the undisputed evidence indicates that Johnson and

Thayer did not immediately notify their managers as they were required to do, and by their

delay violated a requirement of their employment and placed the employer in jeopardy of

legal liability.  As to Knights and Clemons, it was a judgment call whether these individuals operated with the integrity and honesty that the employer demanded.

Still further, and most importantly, it is undisputed that Defendant continued to employ nurses who did reveal their criminal backgrounds.  Plaintiffs' beliefs that they were discriminated against, when viewed in the totality of the evidence, is insufficient to carry their ultimate burden of demonstrating that they were discharged because of consideration of their criminal histories.  In the end, Plaintiffs have offered insufficient evidence that their discharges were because they revealed that they had criminal histories protected by § 296(16).  Accordingly, Defendant is entitled to summary judgment on the second causes of action.  See Obabueki, 145 F. Supp. 2d 371, 387 (S.D.N.Y. 2001);[47] see also Stewart v. Civ. Serv. Comm'n, 446 N.Y.S.2d 948, 950 (1st Dep't 1982).[48]

### b.  N.Y. Corrections Law § 752 Claims

Plaintiffs' third causes of action assert that "Defendant violated N.Y. Correction Law § 752 by terminating [them] on account of [prior criminal adjudications] which [are] not job-related."  Am. Compl. ¶¶ 33, 64, 96, 128.  Section 752 provides in pertinent part:

> No application for . . . employment, and no employment . . .  held by an individual, to which the provisions of this article are applicable, shall be denied or acted upon adversely by reason of the individual having been previously convicted of one or more criminal offenses, or by reason of a finding of lack of "good moral character" when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses . . . .

---

[47](granting employer summary judgment on § 296(15) claim because "[n]othing in the record indicates that IBM's rationale for withdrawing the employment offer was based on the fact of plaintiff's conviction, rather than the fact that he lied on his application")

[48](dismissing § 296(15) and § 752 claims because "[t]here is nothing in the record to indicate that petitioner was penalized because of his prior criminal record . . . petitioner was disqualified simply because he had lied on his application")

N.Y. Correct. L. § 752.

Plaintiffs concede that Defendant could not have violated § 752 with regard to Clemons and Johnson because neither was convicted of a crime. Pl. MOL, p. 18, n. 5. Accordingly, the § 752 claims by Clemons and Johnson are dismissed.

As to Thayer and Knights, the § 752 claims are dismissed for the same reasons that the § 296(16) discharge claims are dismissed.  That is, there is nothing supporting the claims of discriminatory discharge based on Thayer and Knights' convictions other than their subjective beliefs that this was the reason for their discharges.  In light of the undisputed evidence that Thayer and Knights failed to properly respond to various jurisdictions' nursing license application questions; the employer's judgment that Plaintiffs' conduct did not meet the employees' standard of conduct; and the undisputed evidence that Defendant continues to employ nurses with criminal backgrounds, summary judgment dismissing these claims is warranted.

### c.  Libel *per se* Claims

Plaintiffs' fourth causes of action assert that Defendant "published and disseminated a false statement that plaintiff[s] [were] terminated for 'misconduct,'" and "required [Plaintiffs] to report to prospective employers that [they were] terminated for misconduct." Am. Compl. ¶¶ 36-39, 67-70, 99-102, 131-134.  Plaintiffs label this conduct as libel *per se.* Id.

There is no dispute that Defendant provides each Plaintiff with a neutral employment reference listing only the dates it employed the Plaintiff and the position each held. The employment reference contains no reference to, or intimation of, misconduct by

Plaintiffs.  Accordingly, the employment reference, in and of itself, does not provide the basis for a libel claim.  However, Plaintiffs rely on a theory of "imposed self-publication" whereby Plaintiffs contend they were required to "self-publish" the reasons for their discharges in subsequent employment interviews.

New York law has not clearly recognized a cause of action for alleged "compelled self-publication."  See Phillip v. Sterling Home Care, Inc., --- N.Y.S.2d ----, 2013 WL 617008, at *1 (2d Dep't  Feb. 20, 2013);[49] Wieder v. Chem. Bank, 202 A.D.2d 168, 169 (1st Dep't 1994);[50] Jaliman v. Selendy, No. 12820/04, 2005 WL 818447, at *6 (N.Y. Sup. Ct. Match 17, 2005)(unreported decision);[51] Keeney v. Kemper Nat'l Ins. Cos., 960 F. Supp. 617, 630 (E.D.N.Y. 1997);[52] Tischmann v. ITT/Sheraton Corp., 882 F. Supp. 1358, 1371 (S.D.N.Y.1995) (same); but see Kiblitsky v. Lutheran Medical Center, 922 N.Y.S.2d 769, 773 (N.Y. Sup. 2011);[53] Ascione v. Pfizer, Inc., 312 F. Supp.2d 572, 579 (S.D.N.Y.

---

[49]("The Supreme Court also properly directed the dismissal of the second and third causes of action for failure to state a cause of action, since New York does not recognize defamation via compelled self-publication")

[50]( New York law does not "recognize a claim for defamation where the plaintiff himself voluntarily republishes the alleged defamatory words")

[51] ("New York does not recognize a cause of action for defamatory words that are voluntarily re-published by the plaintiff himself")

[52]("New York does not recognize a cause of action for 'compelled self-publication'")

[53]("The Appellate Division, First Department has expressly held that New York does not recognize a cause of action for compelled self-defamation, or "compelled self-publication," defined as permitting "a discharged employee [to] sue for defamation even if an employer made the defamatory statement to no one other than the employee if the employer knows, or should know, of circumstances where the employee is later put in a position in which he or she has no reasonable means of avoiding publication of the statement and must repeat such statement; usually when seeking new employment." . . . Although the Appellate Division, Second Department, has not expressly rejected the tort of defamation by compelled self-publication, it has upheld the general rule that no defamation exists where the plaintiff himself was the only disseminator of the information that he had been fired (see Fedrizzi v. Washingtonville Cent. School Dist., 204 A.D.2d 267, 611 N.Y.S.2d 584 [2d Dept. 1994] ).

2004).[54]  It is this Court's view that New York will not adopt the doctrine and, even if it did, it has no application in the present case.

While "[s]ome states have ... expanded the publication element of a defamation claim in the employment context by adopting the doctrine of compelled self-publication defamation," Cweklinsky v. Mobil Chem., Co., 364 F.3d 68, 74 (2d Cir. 2004),[55] "a host of policy concerns" have led a majority of jurisdictions, including Connecticut, to reject compelled self-publication. Id.  The policy concerns are, *inter alia,* that self-publication is "inconsistent with the fundamental principle of mitigation of damages" and, therefore, has been "largely discredited." Olivieri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997).  Other jurisdictions have refused to adopt self-publication doctrine because "otherwise, the theory of self-publication might visit liability for defamation on every . . . employer each time a job applicant is rejected." DeLeon v. Saint Joseph Hosp. Inc., 871 F.2d 1229, 1237 (4th Cir. 1989).

Moreover, as recently explained by the Vermont District Court, "[t]he requirement of publication is generally not met when a defendant publishes a statement directly to a plaintiff, even if the plaintiff then publishes the statement to a third party." Knelman v. Middlebury College, --- F. Supp.2d ----, 2012 WL 4481470, at *22 (D. Vt. Sept. 28, 2012)(citing Restatement (Second) of Torts § 577, cmt. m).  "Those courts that have recognized the doctrine of compelled self-publication have warned that it 'should be cautiously applied' and thus 'limit[ ] [the doctrine] to situations in which the defamation

---

[54]("The status of the tort of defamation by 'compelled self-publication' is, at best, unclear under New York law.")

[55](citing Colorado, Iowa, Minnesota and California as states that have adopted the doctrine of compelled self-publication defamation)

36

plaintiff 'has no reasonable means of avoiding publication of the statement or avoiding the resulting damages.'" Id. (quoting Sherman v. Rinchem Co., Inc., 2011 WL 3471057, at *12 (D. Minn. Aug. 8, 2011)).

Here, each Plaintiff contends that she reasonably believed, based upon advice of legal counsel, that she was not required to report her criminal history on the various jurisdictions' nursing license applications. Moreover, each Plaintiff asserts that the statements on these applications did not ultimately result in her inability to receive a license in the various jurisdictions. Thus, each Plaintiff is able to avoid publication of the alleged defamatory statement, or avoid the resulting damage, by explaining that she left Defendant's employment based upon a disagreement as to a legal issue that did not result in her disqualification to practice nursing. Still further, and while Plaintiffs contend that they were entitled to refrain from answering the relevant criminal history questions on the various jurisdictions' nursing license applications, there is no dispute that the failure to do so resulted in a violation of the employer's Code of Conduct and Core Values. Thus, the statement that Plaintiffs were discharged because the employer deemed their actions misconduct is not false - an essential element of a libel claim.

Plaintiffs also argue that Defendant published the misconduct allegation when, in June 2010, WellPoint Manager Margaret McDonnell informed a group of employees "that Jackie [Johnson] was fired because of an undisclosed old violation." Knights Decl. ¶ 13;[56]

---

[56]Knights declaration indicates that "[i]n June 2010 we learned of Jacqueline Johnson's termination for 'misconduct.' Knights Decl. ¶ 13. Following this sentence, the declaration describes what occurred on this date ("Our Verizon Group was taken into a conference room where Margaret McDonnell informed us that Jackie was fired for an undisclosed old violation."). Id. Knights does not assert that Ms. McDonnell used the phrase "misconduct" in relation to Johnson's termination, see id., and the first sentence of this paragraph appears merely to be Knights' categorization of McDonnell's statement.

Clemons Decl. ¶ 11.[57]  Assuming the oral statement[58] was made, there is no evidence that

McDonnell used the phrase "misconduct."  Further, the statement itself was not false.

Thus, McDonnell's statement dose not provide a basis for a defamation claim.  See Nekos

v. Kraus, 878 N.Y.S.2d 827, 828-29 (3d Dep't  2009).

Plaintiffs also point to the supposed statement of Steve Flores, a Wellpoint

employee, whereby he purportedly stated that the reason Plaintiffs were fired was

because they "were 'flagged' on FBI background checks."  Clemons Decl. ¶ 29.  The

statement is inadmissible hearsay in that it was conveyed to Clemons by an unknown

individual.  It is well established that hearsay is not competent material on a Rule 56

motion, Sarno v. Douglas Elliman- Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999);

Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir.1997);  see Fed. R. Civ. P. 56(c)(4),[59] and

therefore the statement need not be considered.  Moreover, there is no indication that

Flores functioned as "an advisor or other significant participant in the decision-making

process that is the subject matter of the statement" such to make Defendant responsible

for the statement.  See United States v. Rioux, 97 F.3d 648, 661 (2d Cir. 1996).  As such,

---

[57] Clemons describes the same June 2010 meeting as described by Knights.  Like Knights' account, Clemons does not assert that McDonald used the phrase "misconduct" in relation to Johnson's termination. Clemons Decl. ¶ 11.

[58] The Amended Complaint styles the claims as "libel *per se*."  Under New York Law, "[d]efamation is defined as a false statement that exposes a person to public contempt, ridicule, aversion or disgrace." Town of Massena v. Healthcare Underwriters Mut. Ins. Co., 98 N.Y.2d 435, 445 (2002). Slander is defined as "the speaking of false and malicious words concerning another, whereby injury results to his reputation." Blacks Law Dictionary (6th ed. 1990). It is simply the spoken form of defamation, as opposed to "libel" which is defamation expressed in printing, in writing, or by symbols or pictures. See 43A N.Y. Jur. 2d Defamation and Privacy § 1. The Court will treat Plaintiffs' fourth causes of action as defamation claims, as opposed to libel claims.

[59](An affidavit submitted on a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")

the statement is an insufficient basis to withstand the summary judgment motion.

For these reasons, Plaintiffs' fourth causes of action are dismissed.

**d.  Motion to Amend to Add Retaliation Claim**

Plaintiffs also seek leave to amend their Complaint to allege claims of retaliation.
See Pl. MOL, pp. 23-26.  In this regard, each Plaintiff seeks to add a claim that she
"engaged in protected conduct when she declined to reveal her sealed adjudication;
WellPoint was aware that [Plaintiff] was engaging in such protected activity; [and]
WellPoint terminated [Plaintiff's] employment in retaliation for engaging in such protected
activity." Prop. 2nd Am. Compl., ¶¶ 43-45, 78-80, 114-116, 150-152.  Defendant opposes
amendment, contending that it will be prejudiced by amendment because: (1) discovery
has closed and it did not explore the basis for any retaliation claim when discovery was
open; (3) the case is nearing its end with both parties having moved for summary
judgment on the claims pled in the Amended Complaint; and (3) it would be futile to allow
amendment. Def. Reply MOL pp. 23-25.  In their Sur-Reply Memorandum of Law,
Plaintiffs argue that not only should leave to amend be granted, but that Plaintiffs should
be granted summary judgment on the proposed retaliation claims. Pl. Sur-Reply MOL, p.
8.

Fed. R. Civ. P. 15(a)(2) provides that, even after the time to amend as of right has
passed, "[t]he court should freely" grant leave to amend "when justice so requires."  In
addressing a motion to amend, the Court considers such factors as undue delay, bad
faith, dilatory motive, undue prejudice, and futility of the amendment. Foman v. Davis, 371
U.S. 178, 182 (1962).

The Court will address the question of futility first.  To prevail on a retaliation claim

39

under the NYSHRL, a Plaintiff must demonstrate: (1) engagement in a protected activity;

(2) her employer was aware that she participated in such activity; (3) she suffered an

adverse employment action based on her activity; and (4) there is a causal connection

between the protected activity and the adverse action. See, e.g., Pellegrini v. Sovereign

Hotels, Inc., 740 F. Supp.2d 344,354 (N.D.N.Y. 2010) (citing cases).  As indicated above,

Plaintiffs assert that they engaged in protected conduct when they affirmatively exercised

their right to deny the existence of their sealed adjudications consistent with the

protections of N.Y. Exec. L. § 296(16) and the N.Y. Criminal Procedure Law.  Plaintiffs

further contend that they "engaged in protected conduct through their subsequent protests

to Wellpoint that it was engaging in unlawful practices."  Pl. MOL in Support of Cross-Mot.,

p. 25 (citing Kunzler v. Canon, 257 F. Supp. 2d 574, 579 (E.D.N.Y. 2003)[60]).  Defendant

argues that amendment would be futile because: (1) "[t]he undisputed evidence reflects

that WellPoint terminated Plaintiffs for falsifying government documents and other

misbehavior, not for engaging in any 'protected activity,'" and, (2) the alleged "protected

activity" pled in the proposed Second Amended Complaint consists only of Plaintiffs

"declin[ing] to reveal [their] sealed adjudication[s]," but "'protected activity' for purposes of

a retaliation claim requires making a *complaint*." Def. Reply MOL p. 25 (emphasis in

original).

Defendant's second argument on futility is partially correct.  To present a legally

plausible NYHRL retaliation claim, the claim must allege that the employer was aware that

the plaintiff was engaging in protected activity.  See Reid v. Ingerman Smith LLP, 2012 WL

---

[60](noting that an employee engages in protected conduct when she protests an unlawful employment practice).

2700508, at * 9 (E.D.N.Y. 2012).[61]  However, the proposed Second Amended Complaint alleges that Defendant was aware that Plaintiffs were engaging in protected activity. Plaintiffs further allege that they each informed the employer, before their discharges, of what they believed to be their rights under New York law to refrain from divulging their criminal histories. Plaintiffs will be required to prove this element, but the claims are not facially futile because Defendant disagrees with Plaintiffs' alleged facts.

As to Defendant's argument that "[t]he undisputed evidence reflects that WellPoint terminated Plaintiffs for falsifying government documents and other misbehavior, not for engaging in any 'protected activity,'" that precise issue has not been resolved.  The Court has determined that (1) Defendant articulated a legitimate, non-discriminatory basis for Plaintiffs' discharges, and (2) Plaintiffs failed to demonstrate that their discharges were motivated by consideration of their criminal histories.  But the Court has not addressed (nor will it address it at this stage) the question of whether the discharges were motivated by Plaintiff's protests and/or assertions of what they believed to be their rights under New York law when answering criminal background questions on nursing license applications from jurisdictions outside of New York.  The fact that other concerns (*e.g.* Plaintiffs' criminal histories) did not motivate the discharge determinations does not mean, *a fortiori*, that the retaliation claims are futile.

Regarding the timing of the proposed amendment, Defendant has a stronger argument.  The time to amend the pleadings, and the time to conduct discovery on the

---

[61]("if one makes no effort to secure or advance the guarantees of an anti-discrimination statute by taking any action in response to allegedly discriminatory conduct, there can be nothing for the employer to interfere with")

41

claims in this action, has long passed.  Absent amendment, this case would be ready for

final disposition either by the present summary judgment motions or by trial.  Plaintiffs'

argument that they could not have previously asserted retaliation claims because they did

not know Defendant's asserted basis for the discharges until the summary judgment

motion was filed is wholly without merit.  Plaintiffs were free to conduct discovery,

including taking depositions of Defendant's representative, on the issues pertinent to the

case, including Defendant's asserted basis for the discharges.  To wait until after

discovery is closed to assert the retaliation claims strains the demand for swift adjudication

of the case. See Fed. R. Civ. P. 1.  Be that as it may, however, Defendant does not

appear to be in jeopardy of losing witnesses or evidence material to the retaliation claims,

and, given what has been done by way of discovery, additional discovery and motion

practice can certainly be accomplished in short order.  Therefore, the Court finds that the

prejudice that Defendant may sustain by the delay does not outweigh the judicial concern

to allow matters to be addressed on their merits.  Hence, Plaintiffs' motion for leave to

amend is granted.  However, Plaintiffs are not entitled to summary judgment on claims for

which Defendant had no notice until after the close of discovery.

## V.      CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment, dkt.

# 32, is GRANTED, and all claims in the Amended Complaint are DISMISSED.

Plaintiffs' cross-motion for summary judgment and to amend the Amended

Complaint to add claims of retaliation in violation of N.Y. Executive Law § 296(16), dkt. #

35, is GRANTED IN PART and DENIED IN PART. The motion is granted in that Plaintiffs

are given leave to file a Second Amended Complaint asserting claims of retaliation

pursuant to N.Y. Executive Law § 296.  Plaintiffs' motion for summary judgment on the first four causes of action asserted in the Amended Complaint is denied. Plaintiffs' motion for summary judgment on the retaliation claims is denied with leave to renew.

The matter is referred to the assigned magistrate judge to set expedited discovery, motion, and trial deadlines.

**IT IS SO ORDERED**

Dated: March 15, 2013

Thomas J. McAvoy
Senior, U.S. District Judge